CORY v. The UNION. See Case No. 10,297.

CORYELL (CORFIELD v.). See Case No. 3,230.

CORYELL (SYLVIA v.). See Case No. 13,-713.

COSGROVE (POLK v.). See Case No. 11,-248.

## Case No. 3,261.

### The COSTA RICA.

[3 Sawy. 538;[1] 5 Ins. Law J. 395.]

District Court, D. California. Dec. 13, 1875.

#### NEGLIGENCE—PERIL OF THE SEAS.

Where the master of a steamer attempted to come up the bay of San Francisco in a dense fog, the vessel being in good safety, and the master not being compelled by any exigency to make the attempt, and the vessel was stranded: *Held*, that the master was guilty of negligence, and that the damage to the cargo was not to be attributed to perils of the seas.

[Cited in The Ontario, 37 Fed. 222.]

[Libel in admiralty by Hackfield & Co. against the steamer Costa Rica for damages due to the injury of certain goods shipped on the Costa Rica.]

Milton Andros, for libellant.
Delos Lake, for claimant.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

HOFFMAN, District Judge. The libel in this case is brought to recover damages for injuries to goods shipped on the above vessel. The shipments and injuries to the goods are admitted. The defense relied on is injury by "peril of the seas." The circumstances under which the loss occurred are clearly shown by the evidence.

On the afternoon of September 17, 1873, the steamer Costa Rica, then on a voyage from Honolulu, arrived off this port. A very dense fog prevailed, and the master cautiously made for the land, giving to the Farallones Islands a wide berth to the north. He continued on this course until he discovered the land about a quarter of a mile distant. He at once stood off shore, and having fallen in with a fishing boat, ascertained that he was ten miles distant from the North Head. At 6.20 o'clock he made Seal Rock, a few ship's lengths distant, on his starboard beam. He then stood to the northward to avoid Mile Rock, which is the chief danger to vessels entering the Heads, and soon afterward passed the mid-channel buoy. He then shaped his course directly up the harbor, proceeding slowly and sounding at short intervals. About seven o'clock he found himself in ten fathoms of water. Knowing from this that he had approached very near to the north shore of the harbor, he altered his course to the eastward, and when he had, as he supposed, reached mid-channel, he resumed his direct course up the harbor. Shortly afterwards he discovered land dead ahead and a few ship's lengths distant. The order to back was at once given, but the engineer reported that the propeller was gone. The ship had not entirely lost her headway, and the master, knowing that if she struck on the rocky bluff ahead of him she might founder in deep water, with great presence of mind ordered her helm to starboard and succeeded in beaching her in the small cove which extends from Point Bonita to Point Diablo. The vessel was subsequently hauled off and repaired, but her cargo sustained considerable damage.

It is not denied that the master was one of the most skillful and experienced commanders of this port. He was on deck during the whole afternoon and evening, personally directing every movement of his vessel. The course he ordered was proper, and should have carried him clear of all danger. He is unable to give any certain explanation of the accident. It is conjecturally accounted for by supposing that some current may have caused the ship to drift from her course, or that her compass may have been affected by some disturbance caused by the vessel (which was of iron) or by local attraction, or that perhaps the helmsman did not keep the vessel on the courses ordered by the master.

With respect to the first two of these hypotheses, it is to be observed that the possibility of danger from those causes was well known to the master, and should have been considered before making his perilous attempt to enter the harbor in a dense fog, when no object was visible by which he could assure himself of his true position. With regard to the last hypothesis, it must be said that it involves a confession of negligence. The master could not himself watch the binnacle and at the same time keep a lookout for the land; but an officer could readily have been detailed for the purpose. Where the safety of the vessel and the lives of all on board depended on the prompt and exact obedience by the helmsman of every order given by the master, it was negligence to have omitted any means of preventing the possibility of a mistake. But if it be claimed that every proper and usual precaution was taken, and that the mistakes of the helmsman could not have been guarded against, then the danger from that cause should have been considered before an operation was attempted the success of which entirely depended on the skill and attention of the helmsman.

The real and only question in the case is: Had the master the right to expose his vessel and the lives of his passengers to the risks which he voluntarily affronted? It is not pretended that there was the slightest necessity for attempting to come up the harbor. The wind was moderate and the sea smooth. Safe anchorage could have been obtained at almost any time after entering the Heads, and especially when the master found himself in ten fathoms of water and knew from that fact that the vessel had deviated from her course. It is not pretended that there was any objection or obstacle to anchoring, especially in the cove where there would have been no danger of a collision with other vessels during the night. It is plain that the master, relying on his skill, or perhaps his fortune, and emboldened by previous impunity, voluntarily exposed his vessel to a danger which common prudence would have refused to encounter.

Several experts have testified that the attempt to come up the harbor was, under the circumstances, an act of the highest imprudence. But no testimony on the point is needed. A moment's consideration of the possible consequences of failure will convince any one of the unjustifiable temerity of the attempt. Had the master not succeeded in stranding his vessel on the beach, another might have been added to the long list of appalling catastrophes at sea, occasioned by the rashness or unskillfulness of commanders of ships.

It may seem unnecessary to cite authorities in support of the principles on which I have decided this case. But they have been so emphatically recognized by the supreme court in many cases that a reference to two of them may be appropriate. In the case of The Portsmouth, 9 Wall. [76 U. S.] 682, it was held that "a captain who in the night and in a fog enters a port, supposing it to be his

port of destination, enters at his peril of its being so, unless there have been some necessity for his seeking a port. If there was proper ground to doubt whether this port was the one he supposed it to be, and he could safely wait outside until morning, or could signal a tug-boat to pilot him in, he should not proceed until he can see and know what he is doing." It is worthy of remark that in this case the indications by which the master was misled were such as might have deceived a very careful person, and almost sufficient to justify a belief on the master's part that he was running no risk whatever. In the case at bar the hazard of the undertaking was well known and willfully incurred. In the case of The Mohler, 21 Wall. [88 U. S.] 230, it was decided by the supreme court "that when in a high or uncertain state of the wind a vessel is approaching a part of the river in which there are obstructions to the navigation, as e. g. the piers of a bridge crossing it, between which piers she cannot, if the wind be high or squally, pass without danger of being driven upon one of them, it is her duty to lie by until the wind has gone down and she can pass in safety."

The rule of law laid down and enforced in these cases by our highest tribunal is commended to us as well by its humanity as by its sound policy. It is that the master of a vessel has no right to expose her, and still less the lives of his passengers, to any unnecessary danger.

Decree for libellants.